Iwanda, and may it please the Court, I would like to reserve five minutes for rebuttal. The District Court's decision below should be reversed for two main reasons. First, the Court erred in finding that the life segment arrangements at issue were securities under Howey, even though the investment success depended primarily on forces outside of the promoter's control, rather than the promoter's own entrepreneurial efforts. Second, the Court erred in ordering the equitable remedy of disforgement, without finding that defendant's conduct caused pecuniary harm to investors. Thus to the first issue, life segment policies here are not securities. Here the expected profit from the investment depended primarily on the life span of the insured, not on any managerial effort by the Pacific West. Pacific West's contractual activities of paying policy premiums, monitoring the insured, and delivering the eventual policy payment to investors were ministerial, not managerial. Pacific West purchasers picked their own policies to invest, and were free to seek outside valuation of those policies. But they chose policies amongst an array offered to them by your clients. That is absolutely correct, Your Honor. It's not like when a broker calls me and offers different mutual funds, I get to choose amongst them, but they're still mutual funds, they're still for equities. That doesn't change their status as securities. So the fact that you're offering some alternatives doesn't take away from the fact that it's the selection of the alternatives to offer and the promoter's representation that they have carefully selected what to offer and have acquired these rights at a price that will make them lucrative for the investor in the future. Your Honor, that is right. But I think the more precise analogy here with respect would be not one of a broker offering mutual funds. It would be something like an art consultant or an art gallery who is going to offer to someone who wants to invest in artwork a selection of paintings. And then that individual would decide which painting to purchase. Those paintings would be selected based on their, based on who the artist is, based on that artist's potential to appreciate and value. But nevertheless, courts have not viewed those types of arrangements to be securities. Another analogy is a real estate company's offer of land for purchase. And the company may represent that that particular parcel of land will appreciate and value because of some adjoining development or because of its particular location. But courts have not viewed that to be securities. In fact, Judge Gurdien's opinion in the First Circuit in Rodriguez expressly said that a real estate company can offer land for investment, can represent that this can increase in value because of adjoining developments, but that's not going to be securities unless the company also says that it will further that development from someone. And to use your analogy with the real estate broker, an investor could feasibly do their own research and come up with their own valuation of the land themselves and how it might appreciate. But here you're dealing with medical records and a specialized expertise as the company portrayed in being able to choose certain appropriate policies under parameters of four to seven years and whatnot. Why doesn't that push things more into an area of a securities agreement there? I actually think our solution helps us for two reasons. One is that here what Pacific West did is they did not hire medical examiners. They did not use any proprietary software to evaluate lifespan. So this is different from the situation before the 5th and 11th Circuits. They looked at what was on the face of a policy. They looked at basic, basic data about the insurance age, medical history, family history, and then also before the investors committed the money, Pacific West provided that information to the investors. So the investors had basically the same information that Pacific West has compiled on the basis of that data available with the policies. And they could consult the policies themselves. And at that point, the investors could make the decisions. So they were not locked into the investment, unlike the situation in the other cases where once the investor committed the money, he had to accept one of the policies proffered to them. And in those cases, for instance, the promoter would offer a particular policy that was pre-designed for the investor's investment objectives. Here the investors offered a menu of policies, a range of policies, and they could make their own selection. Hence, should we make something of the fact that this was a fractional interest? I don't think that really, I don't think that actually changes the analysis in this case. I mean, some courts have observed that there may be some difference in analysis depending on the fractional interest versus whether there is an investment in the whole life insurance policy. But I don't think that changes the analysis here because the selection of a policy was done based on these very apparent criteria. I think the investors would make the decision based, again, on the data that was available on the face of the policy. So I think the fractionalization does not change the forefront of how we, which is whether or not the investment and the expectation of profit is going to depend primarily on the efforts of others. The other point that gets raised in these circuit opinions is about part of the value that's added potentially is the purchasing of these policies at a certain price. Why investors aren't doing that. They're not negotiating for these purchases by the trust. So why doesn't that put that into the realm of securities? I think it doesn't. And it's very similar to the, I think the instructive analysis here is a DC Circuits analysis which said that the pre-purchase activities, such as the selection of policies, has a very minimal indication as to whether or not that will be a security because it doesn't tell whether the expectation of profit derives from the efforts of others. That part, that negotiation of the purchase price is already baked into the purchase contract between Pacific Western investors. So in essence, it is divorced from the firm expectation of profit. It is very similar in a way to the situation in NOAA and in Belmont Reed, where the particular company offered silver bars, offered gold or gold for investors, and it offered them at a specific price, which the investors themselves did not control. But the Quidditch court said those did not constitute securities because once the purchase was made, the firm appreciation of that investment depended on market forces. It did not depend on the promoter's own managerial efforts. So this is just the case like that. And then also, I think it is important to look not just at the selection of policies, but also the post-purchase efforts by Pacific West, and all of those who, as I mentioned, ministerial, not managerial. So Pacific West. They did have a somewhat complicated three-tier system for making sure premiums continued to be paid. That didn't say to the investor, okay, you've got to keep paying your share of the premiums. Why isn't that more than ministerial? Your Honor, because that system, the sole purpose of that system was to make sure that the premiums would be paid. So even though the three-tier system was simply designed to ensure that the premiums would be paid for some time the first year. Well, it could be done by telling the person to purchase the fractional interest, you've got to pay this every quarter, month, whatever it is. Instead, Pacific West took that upon itself in a way that sought to assure the investor that we're not going to call upon you to do anything. We've got this taken care of. Trust us. Your Honor, actually Pacific West did not fully, did not make that full representation to investors. It did tell them that it had that premium system, which by pulling some of the resources, sought to ensure that the premiums would be paid. So, yes, the possibility that the investor would be called upon was pretty remote as portrayed to them. But it was exclusively disclosed, and I think, again, it's important that Pacific West said, yes, we have developed a system where we allocate 1% of this particular policy to ensure that the premiums would be paid even if the first year would be insufficient. But they did expressly tell investors there is a possibility we will call upon you to pay the premiums. And, again, this Court said no, that just because a company has devised a system to perform its contractual duties, which is all that it is here, that does not actually make that particular effort managerial. In fact, the Fifth and the Eleventh Circuits, when they looked at the payment of premiums, they did agree that that is a ministerial function. That is not an entrepreneurial function that would characterize that particular investment as a security. But doesn't the structure of it allow for spreading of risks even if certain policies, even if the bet made on certain policies was incorrect and there had to be additional payments made, it didn't fall just on those investors, there was a pool to help that with. Why isn't that more managerial than just, as Judge Clifton mentioned, just a straight allocation of go ahead and pay up, you're due? Ilana, I think that goes to the second prong of Howie, which is whether or not there was a common enterprise, whether or not you can show the commonality, which we do not challenge. But I don't think that that system of ensuring that the premiums will be paid and that the policies remain in force for as long as possible, I don't think that actually changes those, it doesn't make those efforts managerial or entrepreneurial. And fundamentally, the success of that investment and the fractionalized life settlement policies depended on the lifespan of the insured. And what is also important here is Pacific West expressly disclosed that to the investors. It told investors that its estimate of a life expectancy of the insured between four and seven years was just an estimate, it was not a guarantee. The investors acknowledged that they understood that. And Pacific West really had no control over how long the insured will live over that life expectancy. So it is very similar to the market forces that this court said do not actually make the promoters' efforts entrepreneurial. Well, you know, nobody lives forever, not even us. And so the insured is going to pass away. The real question as to whether it will happen soon and whether the price paid for the rights to the benefits for the policy is marked low enough so that in the end there will be a profit. I mean, even a two-year-old may have a long life expectancy, but if you bought the policy cheap enough, it could be profitable. You just have to wait for a good long time. And so I'm not sure. I share the understanding that it's not something that the promoter was responsible for because what really matters here is what price the promoter decides is a price low enough to make the investment profitable when it finally does ripen. You know, that is right. But I think then that actually makes this case very similar to Belmont Trader to know where the company said, look, because of the inflationary appreciation on the market, gold is a good investment. And so our advice is invest in our future properties of gold as opposed to bronze or copper and other metal. So certainly the company does make a decision and does make a selection and recommendation to investors based on certain data and based on estimation of what is going to make a good investment. But then once that purchase is made, the investment does not depend on the efforts of the promoter. And I think the thesis circuit just gave us an opinion, and the thesis circuit is destructive because these pre-purchase efforts, which go to the selection and recommendation of investment, the price for them is already baked into either the promoter's fee or is baked into the contract. And so it is divorced from this expectation of future profit that gold, that really informs the forefront of the Howey test, which requires significant efforts by the promoter. Well, Howey itself didn't seem to distinguish. Now, granted, well, it's come a long ways since then, but that's still the root for this. It's even older than we are. It didn't seem to distinguish between the pre and post. You talked about the substantial efforts made to develop the citrus groves. There were going to be efforts that continue, but I'm not sure that I understand how Howey supports the line between pre and post. I think the thesis circuit's line actually does stem from Howey because Howey speaks about the investor's expectation of profits and whether that expectation of those profits depend on the significant efforts of others. And so in the quintessential cases is where those efforts, efforts to develop the assets or efforts to monitor, to administer the assets, to do something else, something with that asset that the investor has bought. And so the thesis circuit didn't say that the pre-purchase efforts are entirely irrelevant. In fact, when they denied a hearing, they made that point express. But it is the pre-purchase efforts do have a reduced information, reduced indication whether or not an investment is a security. And so in that sense, it is really, it correctly, in our view, implements the test of Howey and it does inform it. And here I think if the court looks at the efforts of the selection of the policy, which again were markedly different and were less involved, did not involve use of proprietary software, did not involve the use of medical examiners who would conduct independent evaluation of these policies. And then if it looks at the post-purchase activities, which involved, which were ministerial in nature, the right answer here, even as this court does not adopt the pre-purchase, post-purchase divide of the thesis circuit, the right answer here is that these were not securities because the involvement of promoter, which was less significant than even in the other cases, in the Fifth Circuit and the Eleventh Circuit cases. If I can turn also to the second question, which relates to disgorgement, and with respect to disgorgement, the Supreme Court in lieu made clear that the equitable remedy of disgorgement must be, I quote, awarded for victims. Therefore, before the court can order disgorgement, there must be victims of the defendant's conduct. And the Second Circuit's claimant goal of finding that an investor has suffered a pecuniary harm is a necessary prerequisite that the investors are victims. I'm trying to figure out what pecuniary harm means, and I don't think there's a common understanding. What do you understand that to cover? Is it purely out-of-pocket? I think it is. I think it means it's out-of-pocket. I think what it means is that the investors actually have lost money from the original amount of money that they have committed to the investment. What about the time value of money, the interest that you would get if you hadn't made this investment? Ioanna, I think the disgorgement has never meant, and the restitution with respect to unjust enrichment has never meant to return the investor or the person who was defrauded to a position where he would have been, where he would receive both principal and also profit. And this court has made it clear in the… Well, profit can come in two ways. One, there is time value to money, court rewards, interest, circumstances, prejudgment interest. There's also what the district court appeared to say here, which is that disgorgement could reach out to cover the promised profits. So, profit can take two forms, and that's one of the reasons I'm having trouble picking up this ice cube as it slides across the counter, because it's hard for me to understand why at least the opportunity cost, the time value of money isn't given consideration for the disgorgement. Ioanna, we don't think that, particularly after Lee, we don't think that disgorgement really looks at the time value of money or kind of the addition beyond the principal that the investor contributed, because the focus is on putting the investor in the status quo. And I think these are the cases that we cite in the… I guess Paul would have been having the money years ago and being able to do something else with it. Ioanna, in a way, but I think that analysis will then necessarily assume that disgorgement will also be able to return to also provide some profits to the investor, because the only way to put the investor back in a position which it would have been had it invested money in some other way is to give him something on top of the original investment. And that has never been understood to be within, to be something that is the restitution that returns the investor, the person to be, that is deferred to the status quo. And I think that, I mean, this quote can look to Goebbels, where that analysis is made. This also stems from Liu, which discusses, I believe it's on page 1948, where Liu discusses and criticizes the treatises and, in fact, the SEC's position, which try to say disgorgement can return more money to the victims than just is necessary to return them to the status quo. What about the statutory change? Did that supersede the Supreme Court? No, Ioanna, the statutory change, I think, and I think, you know, I think both the sentence-circumventment decision but also the amicus brief clearly indicate that statutory change really meant to clarify the uncertainty that resulted after the Supreme Court's caucus decision whether or not disgorgement was effective permissible remedy. It did not mean to legislate or overrule the Supreme Court's decision. Why would that be needed if the Supreme Court already said disgorgement is an available remedy? Ioanna, is it a better reading of the statute that it was an intent by Congress to say to allow the SEC to enforce disgorgement even in the absence of pecuniary harm by the victims? Ioanna, it often happens that the Supreme Court's jurisprudence and also Congressional, what Congress wants to do, move in parallel. That happened in the heaviest context where the Supreme Court's adoption of particularly heaviest rules went unparalleled, what Congress did in amending the heaviest statute. And I think here also there is no indication, and the SEC provides no indication from the Congressional record, from the committee report, or from any kind of floor statements, indicating that what Congress wanted to do was to statutorily override the Supreme Court. And it's a pretty momentous decision. For instance, in the Leadbetter case, it was very clear when Congress reacted to the Supreme Court's decision and overruled it statutorily. Here, the amendment and the enactment, the enactment of Section D7, happened about seven months after the EU decision. It is a fairly short period of time. If Congress really was trying to clarify the discouragement was a proper remedy, it got there roughly at the same time as the Supreme Court in the EU. Hi, Anil. Gautam, Judge Gould. I wanted to clarify two points in my mind. First of all, isn't discouragement an equitable remedy? Ioanna, it is absolutely an equitable remedy, and that, in fact, supports our position that as an equitable remedy in the Supreme Court's EU, discouragement must be actually done for the victims. Therefore, as a matter of equity, there is a need to show that there are, in fact, victims. And so, however, whatever the measure of discouragement, how much money has to be returned, the necessary prerequisite is that the investors must have suffered pecuniary harm because absent of pecuniary harm, they're not victims. And here, the record actually shows there is no debate, and the district court itself even admitted that the investors may get a return of a couple of percent more than their principal investment. And this is in our brief on page 47. And this is a situation where these investors will get the full money that they have contributed to the investment. So they have suffered no pecuniary harm, and they cannot be considered victims. Now, it is true that they would only recoup that investment in the course of a number of years, but that is a function of the nature of the investment. They invest in the life insurance policies where the profitability depended on the lifespan of the insured. And just one last point on discouragement. To the extent that this court is concerned that limiting discouragement to really its equitable nature and requiring a show of pecuniary harm may actually hamstring the SEC's authority and somehow allow an entity, a company that defrauded to keep ill-gotten gains, the SEC actually has expressed statutory authority to seek civil penalties in, I quote, the gross amount of pecuniary gain. And this is section D3B. So the SEC has other ways to force wrongdoers to give up the ill-gotten gains. Discouragement was never designed to do that when there is no showing of pecuniary harm, no showing that they were victims. Let me see if my colleagues have any final questions for now. Great, thank you. We'll give you a little time for a moment. Thank you, Judge. Good morning, Your Honor. May it please the Court, I'm Carrie Dingell on behalf of the Securities and Exchange Commission. I'd like to begin by addressing some of Your Honor's questions on why the fractionalized life settlements in this case are securities, and then I'm happy to take questions about discouragement. Pacific West promised that it would make efforts to maximize the investor profits here in two ways. The first, as Your Honor's pointed out, was by using analysis and expertise to select policies that would pay out in four to seven years while avoiding loopholes that could prevent payout. And the second was by managing the ongoing premium payments to protect investors' returns on their investment from the risk of total loss. So appellants make the point that for the purposes of the Howey test, you're looking at the expectation of profit, but I think they're conflating the ultimate payout of the policy with the profit on the policy. The profits here were dependent on the accuracy of Pacific West's estimation of the debt date and on the payment of the premiums. And investors could lose profit in two ways. One would be by being subject to premium calls because the policy went on for longer than Pacific West had estimated and the reserves ran out. And they would then be subject to premium calls, which would increase their cost basis in the investment and result in a lower profit. The second is that if the premiums weren't paid, they could risk losing their investment altogether. And this brings me to Judge Sanchez's point about, does it matter that these are fractional interests? I think for that second factor, the fractionalization of the interest does make a difference because essentially what Pacific West did was it fractionalized these policies and sold them to different investors. And then the risk, the investors' risk that the premiums wouldn't be paid, were then shared with all of the other investors who had purchased fractions of the same policy. So Pacific West not only said, you know, well, you're going to just buy a portion of the policy and so therefore there's a common interest for the second prong of the Howey test. It went further than that and said, we are going to manage that risk for you. And that's really what I think the essential point that makes this a security is that Pacific West was managing the risk through the pooled premium reserve structure. And in fact, it went each. Which I guess has its limits, right? Because if the wrong bet is made about how long people would live, I think that happened here. You can run through all three of the tiers and be depleted of the funds. And so at some point the structure may not matter so much. I don't know which way that cuts, but. Well, I think it cuts in favor of these being found to be a security because the investors were really dependent upon Pacific West managing those pools so that there would be enough money to keep the policies in force. And there's testimony in the record where the investors said that that was, you know, important to them. In the deposition of Michael Wachs at 2790, he said, It's my understanding that if another investor doesn't make their premium call, the Pacific West is going to take care of it. How critical is this second part of it as to the first part? If the investor knows age, amount of the policy, because gender can figure out from life expectancy tables, can do some basic calculations on his or her own. If you didn't have the premium tier commingling and fractional interest, would it still qualify as a security? I think it could, Your Honor. I think this court doesn't need to determine whether pre-purchase activities on their own can qualify something as a security because there were these significant post-purchase activities. But Calhoun, the CEO of Pacific West, held himself out as having significant experience and expertise in the life of the property. Unlike the real estate broker who says, I know this property is going to get real valuable, or the commodities dealer selling gold. Is this case really different from those acknowledging we've got this premium tier system and so forth? But I'm not sure the first part gets you there. The first part, you know, may not get us there if there's just the pre-purchase policies. This court in Rivera said, you know, you can't divide up the securities into discrete transactions and then sort of look at each one. You have to look at the economic reality of the whole thing. And here I think there's an interplay between that first part where Calhoun is saying, I expect this person to live for four to seven years, and the second part where he's saying we're going to manage this premium reserve structure to make sure that the policy stays in force. Is there a counsel was emphasizing the fact that unlike other deals of this kind, there was no medical input into the selection of these policies. Does that seem important in your mind? I don't think so, Your Honor, because Calhoun was representing that he had other ways of estimating that. I mean, he was sort of holding himself out as having expertise. So if anything, it sort of cuts in favor of these being found to be securities because it wasn't just sort of algorithmic formula that was applied. It was really his own personal judgment that the investors were depending on. So you're putting a lot of emphasis on the second half of it in that case. I would have thought that the government was putting more emphasis on the first half. It seems pretty difficult, you know, if I were an investor to try to pick out, make a best guess as to who's going to, what might happen in four to seven years and those sorts of policies. The structured system is just different pools of money and when it gets access to it. That strikes me as a little bit more ministerial to me. Well, Your Honor, I think they're both important. I do think that it's different from the sort of sales goods contracts cases like NOAA and Belmont Reed because gold is gold and silver is silver. And once you've delivered it to an investor, they're just depending on market fluctuations and themselves deciding when to sell to maximize their own profit. And so there is sort of more expertise that goes into this in the beginning and the investors are depending on, you know, that actuarial estimate carries over through the post-purchase effort. So it's not just that they then have a policy that sort of, you know, has some external value. It's that linkage between the actuarial estimates and the pools of the premium reserves. But on that point, I just want to, you know, make a point that it's not just, you know, and Life Partners, I think, in the D.C. Circuit case, the company was making premium payments, but it really was a more ministerial action than what was happening here because they just escrowed the premium payments and then they were paying them out every month. In this case, Pacific West actually had discretion to decide when to tap into the second and third tiers and, in fact, Calhoun covered many of the premiums himself when policy started to run up so that he wouldn't need to tap into those pools. And the summary judgment hearing below, the Appellants Council agreed that Pacific West would have had the ability to either do capital calls from investors or take from the reserves or some combo of the two. So there was discretion in managing that premium structure. It was not the case that the premium reserve structure just sort of was put into place and then played out automatically. So there were significant post-purchase managerial efforts. So what about the disgorgement side of things? So moving on to disgorgement, the disgorgement award in this case requires the appellants to disgorge a fraction of the unjust enrichment that they obtained from violating the securities laws by selling securities in unregistered transactions. That award aligns with decades of disgorge precedent with Platforms Wireless, with Luby SEC, and with the statutes authorizing disgorgement of unjust enrichment. Were there victims here? Yes, Your Honor, there were victims here. And how do we measure what makes a victim and what the level of loss, pecuniary loss, is? Well, Your Honor, that's an interesting question. Because the pecuniary harm requirement was created in the Second Circuit's opinion in Goebel, we don't have a lot of guidance from courts about when there has been pecuniary loss because disgorgement has never been understood to be a compensatory remedy. This Court in Platforms Wireless distinguished disgorgement from damages. It is measured by the defendants' unjust enrichment. It's not measured by the victims' loss. And so there's not really a lot of case law around that. Here, though, we have a receiver who was appointed who said the investors are out of pocket. $107 million when the case started, the receivers managed that down to $69 million. But there's still $69 million in outstanding losses that this disgorgement could be used to compensate. That says when? Is it 2021? And I got lost trying to calculate these things. And, of course, the record doesn't bring us to date. But where do we stand? So I just looked at the receiver's report from November. So as of last month, it was still the $69 million figure. People aren't dying on demand, I guess. I think, you know, the receiver has a lot of discretion in terms of how to manage the funds that come in. And so I'm not exactly sure how, you know, where that stands in terms of if. I think the determination that the receivers made is to pool all of the funds and then try to get money out to investors on a sort of pro-rata basis as opposed to paying out the particular investors when the insured on their particular policy passes away. So to go back to Judge Clifton's earlier question, what makes a victim here? So they were victims because they invested in fractionalized life settlements that should have been registered under the securities laws. The appellants who are left in the case don't have fraud charges against them. But there were fraud charges against Pacific West and Calhoun. But these defendants don't. That's one of the things that makes this hard. Fraud cases, we're used to. Failure to register cases, yeah, we know they're there. But the injury isn't necessarily the same. And that's what much of this argument is. Should we be looking at disgorgement in terms of unjust enrichment when, in fact, suppose there is no victim? Suppose, in fact, everybody comes out whole by whatever test you use. Is there still reason for disgorgement? Yes, Your Honor, and just to make a few points. First is that the Supreme Court made it clear in lieu that disgorgement remains a profits-based measure of unjust enrichment. So it is measured by the defendant's unjust enrichment, and it aims to deprive the wrongdoer of their ill-gotten gains. That's the purpose of disgorgement. It is not to compensate victims. The court used the awarded for victims language when it was talking about how to distribute the funds because the court criticized the pre-lieu practice that it found the SEC had sometimes engaged in. But this becomes a profit center for the government. Of sending money to the Treasury, exactly. Instead of sending it to known victims. And so the court... How do we know that's not going to be the case here? Well, because the SEC intends to turn the money over to the receiver to use that to compensate the victims. And the disgorgement here is a few hundred thousand dollars. There's $69 million of outstanding loss. And I know there were arguments in Appellant's brief made saying that they could recover that money at some point in the future by 2032. But because it's a no receivership, the district court will retain jurisdiction over what happens to the money and can decide what to do in the event that there is... So if there's a surplus, the district court can address that problem? Yes. Yes, Your Honor. And that's the case because there's a receivership here, but if there was an SEC fair fund, the court would retain jurisdiction in that event as well. And so this is really a distribution issue. And Lew didn't intend to... There's no suggestion in Lew that it intended to change disgorgement from an unjust enrichment remedy to a compensatory damages remedy. Those are two very different things. Let me... Counsel noted page 1948 from Lew. And the court there discusses the government's argument that the primary function of depriving wrongdoers of profits is to deny them the fruit of their ill-gotten gains, not to return the funds to victims as a kind of restitution. And then later on the court says, but the SEC's equitable profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains to hold otherwise what render meaningless the latter part of the statute. So why doesn't that push back a little bit on your argument that it's still a profit-based focus? So two things, Your Honor. First, the court was responding specifically to the clause in Section 21d5 of the Exchange Act that says that disgorgement must be appropriate or necessary for the benefit of investors. And it said that that was an additional limitation on equity. And so as Your Honor pointed out earlier, there was an amendment to the Exchange Act post-Lew in which Congress expressly authorized the remedy of disgorgement and did not include that for the benefit of investors language. So to the extent that that operated as a restriction that required money to go back to investors, we would say that's no longer operative. But I take counsel's point that if Congress really did intend to overrule or supersede a part of Lew, I would imagine it would have said something at some point rather than just for us to grasp a fumes of it. So our position is not that it intended to overrule Lew. It's that Lew pointed to two bases for this idea that money should go back to investors. One was it said equity generally requires it. And the second was that the statute has this further restriction that says it needs to be necessary or appropriate for investors. It's hard for me to interpret Congress's later action as say, okay, this could be a profit center for the government. You don't have to worry about restoring the investors' losses. Am I wrong about that? No, Your Honor, but here that's not an issue because I think what Lew was getting at was about whether money could go to Treasury or not. Although it ultimately withheld judgment on that question and said the lower courts could figure out whether it was consistent with equity to send money to Treasury. It suggests we should be doing the same. And that is since we don't know for sure what will happen with the receiver's effort, the district court still has jurisdiction. It can address that. Exactly, Your Honor. There's no judgment in this case directing money to Treasury. The disgorgement will be used in a compensatory manner. And so there's no issue from a Lew perspective. And the court doesn't need to wade into the Treasury argument or really wade into this distinction in the statute. The district court with regard to the current parties didn't say return everything, said return one-third. And I understood that because in this context the district court also acknowledged that they had a pretty good reason perhaps for believing what they were doing didn't require registration, didn't find scienter the knowledge of wrongdoing on their part, so decided to cut back some. I'd like you to address both that in the context of the one-third measure and also whether a civil penalty of any kind or an injunction against somebody who was dealing with something he fairly could have thought was okay to do, how are those remedies appropriate? So, Your Honor, the disgorgement is a discretionary remedy. And so while the court could award up to the full profits that the appellants obtained as a result of their violation, the court was well within its discretion in saying, weighing the equities and the factors and looking at how much other defendants in the case had been ordered to disgorge or had agreed to disgorge, I'll only order a third of it. So I think, you know, there's no issue with that because it is, the court has discretion because it's an equitable remedy, which the commission agrees that it is. What about the more punitive elements, the civil penalties and the injunction? So the statutory scheme gives courts authority to award penalties even for any violation of the securities laws. But saying the court can doesn't mean that it should. Well, here, the penalty was $15,000 per appellant. The statutory award could be $7,500 per violation. The courts have discretion in how to count violations in Murphy II, the 2022 Murphy case. This court made it clear that it's within the district court's discretion to count violations. Violation could have been each sale that the appellants made, could have been, you know, one violation per month that this scheme was on. But it is a penalty. And if you don't have scienter or knowledge of wrongdoing by the party, why a penalty? To deter others from making the same mistake, essentially. So you can impose a penalty for a mistake? Well, here I think it goes beyond a mistake and I think the district court made it clear that he thought that it was questionable that the appellants were selling these things on. He seems to mostly point to the multiplicity of time or doing it over time and doing it a number of times. But if he doesn't find scienter, and they've got these law office opinions saying you can do it this way, why is it that these individuals are expected to know better and expected to determine? I mean, God knows we've spent a lot of time or a lot of pages trying to figure out whether this is an investment contract. I'm not sure I want to say that these individual appellants should have figured that out. So the court pointed to the fact that they were making specific representations to investors about the premium reserves without having any knowledge, except that there were premium reserves that could be used to keep payments in force, the insurance policies in force, except for Calhoun's own say so. And so the court seemed to think that that was not reasonable, even after Calhoun had told the appellants that there was, you know, that some of the second tier of the reserve structure had been tapped into, that they continued to sort of make representations to investors about this. And so I think the court, you know, looked at that and decided that a relatively small penalty was appropriate based on the facts and circumstances here, which is consistent with what the court was permitted to do under the statutory scheme. So I see that I'm over time. Unless the court has any further questions, we would ask you to affirm the judgment of the district court. Thank you, counsel. And we will add, is there any time remaining? We'll give you a couple extra minutes. Thank you, Judge Sanchez. To address the premium system first, I don't think the premium reserve system by itself transforms us into managerial efforts. It is the entire design of premium system is to ensure premiums will be paid. It is not qualitatively different than setting up some kind of an escrow. If I can make an analogy, it's as if in the NOAA case, a company that actually, that induced investors to purchase silver bars, then said, look, we will set up an offer to store them for a year for free, or for some kind of system saying, we're not just going to put these bars in the warehouse. We're going to put them in a secure safe. We're going to hire guards. We're going to implement the state of art security measure. We will really make sure that your investment in silver remains safe for that year that we store it. I don't think that the court in NOAA would say that kind of contractual duty to ensure the gold would be safely stored and not just put somewhere where it can be pilfered easily would constitute entrepreneurial efforts. I think with respect to the fact that Pacific West did not perform any kind, did not engage independent medical examiners, did not conduct an in-depth medical assessment of a type that was done on life partners, is important. Because it shows that the investors had essentially the same knowledge as Pacific West. So when they decided to invest, they were not investing without actually access to the life insurance policy, without access to the analysis that the promoter has made. So that takes this case out of the cases like the Fifth Circuit, the Eleventh Circuit. And it even is, it actually is similar to even the case before the DC Circuit where there was a detailed examination of significant medical history, medical indicia. With respect to discouragement, I think what is important is that, my friend on the other side focused on what is the measure of discouragement. But that is a different question from whether or not there is a prerequisite for the order or for the imposition of discouragement itself. How discouragement is measured and whether it should look to the ill-gotten profits or whether they should adopt some kind of measure is a secondary question. The first one is the court, the Supreme Court in the U.S. said, discouragement must not only deprive the wrongdoer of the ill-gotten profits, but it also must be looking to compensate the victims and return them to the status quo. And if there are no victims, if there is no showing of a pecuniary harm, then that requirement is not met and discouragement may not be offered. But how can we say there is no pecuniary harm if the most recent report from the receiver leaves a $60 million hole? Well, I think that is at this moment in time. I think if you look at the record citations in our brief on pages 36-37, particularly Volume 2 of the Experts of Records, page 118, and if you look at what the district court said, this is Volume 16, Experts of Records, page 4189, they did acknowledge that in the fullness of time, these investors will recoup the entire principle and in fact there may be extra money left. So I think this is a somewhat unusual case where the record does indicate that the entire principle will be made available to the investors. Again, perhaps not at this moment in time and I'm not aware of how exactly the recipient, I think. Yes, counsel. You underscored the time value of money. The money will eventually come in because people are going to die, but it matters whether they come in next week or 20 years from now. Why should we disregard that? Your Honor, because I think that goes to the question, that goes to the question of the profit. And I think as this court said in DCD programs versus Leighton, the unjust enrichment, disgorgement, do look to placing the individual in the position of a status quo. They don't try to actually realize the profit, which will be compensating the investors for the time value of money. Just one mention about the amendments to D7. The fact that Congress there omitted the language for the benefits of the victims is not really indicative that Congress intended to prescribe, to bless the SEC with a larger disgorgement authority because when Congress legislated, it legislated against the background of what the Supreme Court said in lieu. And the Supreme Court, in lieu, said approve of the disgorgement because it found that disgorgement was a remedy present in equity and the requirement of a remedy be available in equity is that it was available to the Court of Chancery in 1789. So when Congress uses the term disgorgement, it really brings all the equitable old soil with it. And so the limitation of disgorgement, namely that it must not only deprive the wrongdoer of profits, but also be for the victims, also accompanies the use of disgorgement in Section D7. And I haven't answered the question with respect to the points that Judge Clifton raised on the civil penalties, but we do think, as we said in our brief, that the district court should not have imposed those penalties, certainly not without an evidentiary hearing. Counsel, thank you both for your very helpful arguments. The matter will stand submitted, and the Court is adjourned. All rise. This Court, for this session, stands adjourned.
judges: GOULD, CLIFTON, SANCHEZ